IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| GIFT SURPLUS, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>STATE OF NORTH CAROLINA ex rel. ROY COOPER, GOVERNOR, in his official capacity; JOSHUA STEIN, ATTORNEY GENERAL OF THE STATE OF NORTH CAROLINA, in his official capacity; NORTH CAROLINA DEPARTMENT OF PUBLIC SAFETY; SECRETARY OF PUBLIC SAFETY EDDIE M. BUFFALOE, JR., in his official capacity; ALCOHOL LAW ENFORCEMENT DIVISION; DIRECTOR OF ALCOHOL LAW ENFORCEMENT DIVISION BRYAN HOUSE, in his official capacity;<br><br>    Defendants. | No. 1:22-cv-148 |

## VERIFIED COMPLAINT AND NOTICE OF CHALLENGE TO CONSTITUTIONALITY OF STATE STATUTE

Plaintiff Gift Surplus alleges as follows:

1.    In 2010, the North Carolina General Assembly enacted North Carolina General State section 14-306.4 (the "Video-Sweepstakes Statute" or "Statute"). This criminal statute purports to ban otherwise lawful sweepstakes promotions that use an "entertaining display" containing video simulations of

gambling. A stated purpose of the law was to prohibit simulated gambling entertainment because it would allegedly encourage real gambling.

2. This Video-Sweepstakes Statute is vague and overbroad. The Statute allows state and local law enforcement to arbitrarily decide which sweepstakes promotions are criminal. The Statute is so broadly sweeping that it contains an express provision that if a video sweepstakes promotion complies with the Statute, but does so by undefined "subterfuge or pretense," the Statute intends to ban that video sweepstakes and support its criminalization.

3. In essence, the Video-Sweepstakes Statute was enacted so that state and local law enforcement, as well as the courts, could criminalize any type of video sweepstakes promotion that they deemed objectionable.

4. And over the past decade, that is exactly how the Statute has been interpreted and applied. Regardless of whether an entertaining video sweepstakes promotion complies with language of the Statute and the subsequent tests adopted by the North Carolina appellate courts for application of the Statute, law enforcement has selectively enforced the Statute against companies like Gift Surplus. And every time that enforcement has been challenged, the North Carolina appellate courts have, through a mishmash of inconsistent, irreconcilable, and ever-changing opinions, ultimately interpreted the Statute to allow that selective enforcement.

2

5. For example, the Statute targets one type of promotion only: sweepstakes. N.C. Gen. Stat. § 14-306.4(b). The Supreme Court has repeatedly reaffirmed that "only sweepstakes conducted through video games of chance" are criminalized by the statute. *Gift Surplus, LLC v. Cooper,* 2021-NCSC-1, ¶20. "Sweepstakes" are statutorily defined as "any game...a person may enter to win or become eligible to receive any prize, *the determination of which is based upon chance*." *Id.* 14-306.4(a)(5). Yet, the Supreme Court criminalized Plaintiff's latest sweepstakes promotion by contradictorily declaring that whenever "*chance determines the prizes for which players may play*," a video sweepstakes is automatically illegal. *Gift Surplus*, 2022-NCSC-1, ¶ 30. In other words, although acknowledging that the Video Sweepstakes Statute only criminalizes video-sweepstakes conduct through games of chance, the Supreme Court has outlawed Plaintiff's sweepstakes by using reasoning that would make *all* video-sweepstakes promotions illegal.

6. This internal inconsistency is not surprising. The Statute actively invites law enforcement and the courts to decided whether a sweepstakes promotion is prohibited or permitted based on a purported spirit, rather than the letter, of the law. N.C. Gen. Stat. § 14-306.4(c), The result of this legislatively blessed selective enforcement is a legal construct in which no one except the Supreme Court can ascertain what entertaining video sweepstakes

promotions will be subject to criminal prosecution. The only certainty is that if law enforcement wants to criminalized a certain video sweepstakes promotion because it involves entertaining *simulated* gambling, North Carolina law will be reinterpreted to support that prohibition. This is unconstitutional.

## **Parties**

7.     Plaintiff Gift Surplus, LLC, ("Gift Surplus") is an Arizona limited liability company that sells many products, including electronics, home goods, jewelry, toys, and social games throughout North Carolina, including Richmond County, North Carolina.

8.     Defendant Governor Roy Cooper is Governor of the State of North Carolina and its chief executive officer. As the State of North Carolina's chief executive officer, Defendant Cooper is charged with faithfully enforcing the laws of the State of North Carolina. Defendant Cooper is sued in his official capacity.

9.     Defendant Attorney General Joshua Stein is the Attorney General of the State of North Carolina. Defendant Stein may intervene in proceedings before any courts, regulatory officers, agencies or bodies, either state or federal, on behalf of the State and is the State's authorized legal representative

charged with defending the interests of the State in all criminal and civil suits. Defendant Stein is sued in his official capacity.

10.     Defendant Secretary Eddie M. Buffaloe, Jr., is Secretary of the North Carolina Department of Public Safety, which is a cabinet department and agency of the State of North Carolina.  The Department of Public Safety is the administrative agency in North Carolina responsible for the state's law enforcement responsibilities.  Defendant Buffaloe is sued in his official capacity.

11.     Defendant Director Bryan House is a Director of the Alcohol Law Enforcement Division ("ALE") of the North Carolina Department of Public Safety and an agency of the State of North Carolina.  ALE is directly responsible for enforcing criminal laws in North Carolina pertaining to alcohol, controlled substances, tobacco, lottery, bingo, and gambling, and in particular is responsible for enforcing N.C.G.S. § 14-306.4, which is the statute being challenged through this Complaint.  Defendant House is sued in his official capacity.

### Jurisdiction and Venue

12.     Plaintiff's claims are brought pursuant to 42 U.S.C. § 1983.

13. This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. §§ 1331 and 1343. Specifically, Plaintiff seeks redress for deprivation of rights secured by the Constitution of the United States.

14. Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. § 1391(b). A substantial part of the events or omissions giving rise to the claim occurred in the Middle District of North Carolina federal judicial district.

15. The declaratory and injunctive relief sought by Plaintiffs is authorized by 28 U.S.C. §§ 2201 and 2202, by Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the legal and equitable powers of the Court.

## Factual Allegations

### *Gift Surplus' Business Model*

16. Plaintiff Gift Surplus operates an online marketplace that sells a large and rotating assortment of consumer products and social games at competitive prices.

17. Gift Surplus' product line includes (among others) electronics, kitchen supplies, home goods, jewelry, and sporting equipment from well-known companies. The image below captures a fraction of the items currently available for purchase on Gift Surplus' website:

Case 1:22-cv-00148-CCE-JEP   Document 1   Filed 02/22/22   Page 6 of 63





Pet Automatic LED Fountain 81oz / 2.4L Water Dispenser for Cats Dogs

**$52.50**

Tipping Trailer for Lawn Tractor 661.4lbs Load

**$455.74**

Outdoor hammock set includes 102*45*38 inch black steel bracket, 6.7*5 feet polyester cotton red striped hammock cloth, suitable storage bag, manual, can carry 450 pounds, courtyard party outskirts RT

**$164.64**

18.

19.     Gift Surplus also develops, markets, and sells social e-games that customers can purchase through its e-commerce platform and then play online using computers and mobile apps (the "Social Games").  These are similar to the well-known social games marketed by other companies (including Apple, Google, Facebook, and Nintendo), and are played solely for entertainment purposes; no prizes are awarded.

20.     Gift Surplus' Social Games are part of an emerging and growing industry that generates more than $100 billion annually, including for market participants like Apple, Google, Facebook, and Nintendo.

7

21.     Through the sale of both its consumer goods and Social Games, Gift Surplus operates an active and viable e-commerce business.

22.     The vitality and growth of Gift Surplus' business model depends on its ability to attract customers to the Gift Surplus e-commerce portal to purchase its consumer goods and Social Games.

23.     To compete successfully against online e-commerce giants that sell similar products, Gift Surplus must pursue innovative and cost-effective marketing strategies.

24.     Gift Surplus has adopted a cost-effective way to attract new customers to its website and establish its brand name in these two highly competitive e-commerce markets: promotional sweepstakes.

***Sweepstakes Promotions in General***

25.     Sweepstakes promotions are a common and proven marketing tool used by retailers to reward existing customers, attract new customers, and draw attention to retailers' products and services.  Sweepstakes are one of the most cost-effective and marketing-effective promotions a retailer can use to promote its business.

26.     Sweepstakes prizes are awarded to sweepstakes participants based on chance, with sweepstakes promotions often using random drawings or instant-win games to award prizes.

8

27. In the digital age, paper sweepstakes are increasing being replaced by game-based video-sweepstakes promotions. For-profit companies such as T-Mobile, Pizza Hut, Coca-Cola, McDonald's, and Royal Caribbean International, as well as many nonprofit organizations, offer video-sweepstakes promotions.

28. To avoid violating federal laws and regulations, sweepstakes promotions must comply with various federal requirements designed to make sweepstakes promotions fair.

29. Sweepstakes promotions like Plaintiff's are not gambling. Gambling is either completely prohibited or heavily restricted in many states, including in North Carolina. While most gambling has long been criminal under North Carolina law, not all gambling is illegal. For example, the North Carolina General Assembly allows the State to offer lottery games. The General Assembly also allows traditional casino games to be offered on tribal lands within the borders of North Carolina. *See generally* N.C. Gen. Stat. § 14-292. The Eastern Band of Cherokee Indians operate two casinos and a bingo parlor, and the Catawba Indian Nation operate another casino.

30. Gambling is a scheme that involves three required elements: consideration (i.e., bet or wager), game of chance, and a prize or reward. *See,*

9

*e.g., Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 749 S.E.2d 429 (2012); *State v. Lipkin*, 169 N.C. 265, 271, 84 S.E. 340 (1915).

31.     Historically, gambling was broadly outlawed in most states.   But times have changes.  Today, many states now run their own gambling schemes, while also allowing private companies to offer various forms of gambling and wagering.  State-sponsored and state-approved gambling is a growing segment of the U.S. economy. Nationwide, annual commercial gaming revenue reached nearly $45 billion in 2019.  Las Vegas alone accounted for at least $3.65 billion in revenue in 2020 (amidst a global pandemic). Las Vegas has long been a top tourist destination, attracting more than 42 million visitors each year from 2015 to 2019.

32.     Even in states where gambling is still broadly outlawed, game-based activities typically can avoid running afoul of a state's traditional gambling laws by removing any one of the three elements of gambling:  prize, game of chance, or a bet/wager/consideration.

33.     In North Carolina, the element of chance is removed when the outcome of a contest or game is determined mostly by the player's skill or dexterity, rather than mostly by chance.

34.     Consideration is removed when a contest or game does not require a participant to make a payment or risk something of value to play the game.

10

The absence of a bet/wager/consideration is what separates sweepstakes promotion from illegal gambling. Indeed, federal law requires sweepstakes promotions to be open to anyone who wants to participate in the promotion, including regardless of whether players purchase anything from sweepstakes promoters. *See* 16 CFR § 310.3.

35.    One of the most well-known sweepstakes promotions is McDonald's "Monopoly" game. This promotion involved both physical and electronic components and was based on the famous board game of the same name. Players were given game pieces when they ordered certain menu products, which were affixed to the packaging. Some game pieces represented a property from the board game; others awarded instant prizes, such as a free order of fries. Players could collect related properties to claim an associated prize. For example, a player who managed to collect both Park Place and Boardwalk could redeem the game pieces for $1 million. At one point, this sweepstakes also included an online counterpart. Game pieces included a code, which could be entered online to grant the player one "roll of the dice" on a Virtual Monopoly game board. The player could collect a property if it landed on one or could obtain an instant prize by landing on certain squares (such as Go or Free Parking). By using multiple codes throughout the promotion period,

11

the player could collect multiple properties and earned a prize if she collected all the properties in a single color group.

36. Publishers Clearing House (PCH) is a well-known example of a company that successfully offers sweepstakes promotions nationwide and has done so for many years.

37. PCH is a direct-to-consumer company that sells consumer goods and magazine subscriptions. PCH first began offering sweepstakes promotion to increase its subscription sales in 1967 and continues to do so today.

38. PCH is best known for its high-profile, high-dollar sweepstakes prizes where winners are surprised at their home by a "Prize Patrol," with camera crews capturing the winners' reactions as their prizes are revealed.

39. While PCH's sweepstakes promotions still award large prizes several times a year in person, even PCH has modified its sweepstakes promotion to adapt to the digital age. PCH now operates and offers an abundance of daily, digital sweepstakes promotions that award prizes ranging from $1.00 Amazon gift cards to $20,000.00 in cash.

40. Critical to PCH's online success is PCH's free-to-play sweepstakes games of chance. While PCH's electronic sweepstakes games might be said to require some minimal level of skill, all of PCH's sweepstakes prizes are still awarded based on a random selection process. No player is guaranteed a prize,

12

much less a prize of a specific value, no matter how well she plays the associated games. Many of PCH's online games have a distinct "gambling" theme. For example, PCH's website has an entire section called "PCHslots" that is devoted to virtual slot machines. A screenshot from one of these games appears below.



41.     People can enter PCH's online sweepstakes in a variety of ways. For example, participants can play daily virtual slot machine tournaments that simulate a gambling experience. People can also play token games that

enter players into a cash prize drawing after every ten games played, while also allowing a player to use tokens they have earned to enter into additional sweepstakes promotions.

### *Gift Surplus' Video Sweepstakes Promotion*

42.    Gift Surplus' video sweepstakes promotion is similar in many respects to PCH's sweepstakes promotion.

43.    Gift Surplus' sweepstakes promotion is designed to promote sales of Gift Surplus' gift cards, and by extension the products and Social Games being sold on the company's e-commerce website.  Gift Surplus' sweepstakes promotion is critical to Gift Surplus' efforts to attract new customers and to maintain existing customers.

44.    Gift Surplus' sweepstakes promotion is primarily operated through kiosks placed in retail locations throughout the State—such as convenience stores and restaurants.  The kiosks are located in businesses that are most likely to be patronized by customers who would be interested in buying Gift Surplus' online products.  For example, the image below shows a sweepstakes participant claiming his prize from the clerk at one store typical of those where Gift Surplus kiosks are located.

14



45. Within the Middle District of North Carolina, approximately 600 Gift Surplus kiosks are located in various retail locations.

46. Gift Surplus does not own, operate, or permit placement of its kiosks in sweepstakes cafés or parlors. Gift Surplus only permits its kiosks to be placed in established retail businesses (*i.e.,* businesses that sell an assortment of other products or services). Gift Surplus' kiosk contract limits the number of kiosks available at any location.

47. Law enforcement officials claim that sweepstakes parlors increase crime. Gift Surplus has supported legislative proposals to ban sweepstakes parlors. The General Assembly has declined to adopt such legislation.

48. Gift Surplus' sweepstakes kiosks do not lead to increased criminal activity. Owners of these retail businesses in which the kiosks are located

15

want customers to feel safe. If Gift Surplus' kiosks increased crime at the business locations where they are placed, the third-party business owners would cease to make the kiosks available at their places of business. This has not happened; Gift Surplus' business partners continue to locate small numbers of kiosks at their stores.



*A local community grocery store in the Latham Park neighborhood of Greensboro that offers Gift Surplus kiosks to its customers*

49. These kiosks utilize a multitude of marketing materials and techniques designed to attract customers to Gift Surplus' e-commerce portal.

These marketing materials include catalogues, posters, and digital ads that advertise Gift Surplus' consumer products and Social Games. Gift Surplus uses the kiosks to sell gift cards that can then be used to purchase goods on Gift Surplus' consumer-goods website and to play Gift Surplus' Social Games on its social gaming website.

50. The gift cards purchased at the kiosk never lose their value or expire. Customers can redeem any unused gift card balance indefinitely to purchase thousands of consumer goods and Social Games from Gift Surplus' e-commerce portals.

51. When a gift card is purchased, the customer is offered free entries into Gift Surplus' sweepstakes promotion. Just like some consumers buy popular soft drinks because they want to check the underside of the cap to see if they have won prize, some consumers purchase Gift Surplus' gift cards because they want to enter a sweepstakes that might award free prizes.

52. Like all sweepstakes promotions, Gift Surplus does not require anyone to make a purchase to participate in Gift Surplus' sweepstakes promotion. For individuals who do not want to purchase a gift card, Gift Surplus offers multiple ways for those individuals to obtain free sweepstakes entries, including asking a store clerk for a free voucher, calling a toll-free number, sending an email, or completing an online form.

17

53.  All Gift Surplus sweepstakes entries are treated the same, regardless of whether a person obtains a sweepstakes entry through the purchase of a gift card or obtains the entry by one of the free methods.  In other words, people who obtain their sweepstakes entries without purchasing gift cards are just as likely to win sweepstakes prizes as the people who obtain their sweepstakes entries with the purchase of a gift card.

54.  Those who choose to participate in Gift Surplus' sweepstakes promotion must play an entertaining game that communicates a simulated, but fake, gambling experience.  As shown below, the entertaining casino-themed game is played at the kiosk using the kiosk software:



Case 1:22-cv-00148-CCE-JEP    Document 1    Filed 02/22/22    Page 18 of 63

55. The game is designed to look similar to a slot machine. Like a slot machine, the game has three rows of images. Achieving a winning combination of images on the center horizontal line is how the player wins the prize.

56. Unlike a slot machine, however, the player does not pull a lever or hit a button to reveal a random alignment of the images that might not award any prizes. Rather, in Gift Surplus' sweepstakes, every sweepstakes entry offers sweepstakes entrants the ability to win a cash prize. After an initial alignment of images appears on the screen, the player must determine out how to create a winning combination based on the images on the screen and then realign the images to create that winning combination. The player is allowed to make two moves or "nudges" to move an image from the top or bottom line to the center line. If, in two moves, the player can find and execute the winning combination on the center line, the player wins a pre-determined cash prize. In other words, the player determines which images to move to the center line and controls the outcome of the game. Chance only determines the particular cash prize that is awarded in each sweepstake game. Like traditional sweepstakes promotions, North Carolina's Video-Sweepstakes Statute requires that the prize be determined based on chance for the promotion to be considered a "sweepstakes," *See* N.C. Gen. Stat. § 14-306.4(a)(5).

57.    While participation in the sweepstakes is optional, customers often choose to participate in sweepstakes because they provide opportunities to win free prizes without having to risk anything of value.  Moreover, the games used by sweepstakes promotions have entertainment value to the participant because players find them fun, exciting, or helpful in relieving stress or boredom.

58.    Consistent with both the traditional, dictionary definition of a sweepstakes, *see, e.g., Sweepstakes*, Black's Law Dictionary (11th ed. 2019), and the statutory sweepstakes definition adopted by the North Carolina General Assembly, Gift Surplus' sweepstakes software randomly selects the prize for each sweepstake entry before the customer begins the game. *See* N.C. Gen. Stat. § 14-306.4(a)(5).

59.    Unlike gambling, participants in the Gift Surplus sweepstakes promotion have no risk or bet. All sweepstakes entries are offered to customers for free, with or without a purchase.

60.    And unlike gambling, every Gift Surplus sweepstakes entry gives a player the opportunity to play a game that is winnable.  If the player uses skill to successfully complete this game, then the player receives the pre-selected prize, which ranges from less than $1 to $2,400.

20

61.  If the player fails to use his or her skill to successfully complete the game, the player receives nothing.  But because sweepstakes participants place no bets or wagers, that same player also loses nothing.

62.  Regardless of whether the sweepstakes game is won or lost, any customer who purchased a gift card walks away from the game with the full value of any gift card that he or she chose to purchase, and can use that gift card to purchase the product offered on Gift Surplus' e-commerce website.

63.  Customers who buy Gift Surplus' gift cards and products do not have to participate in the sweepstakes promotion.

64.  Sweepstakes entries are promotional gifts that Gift Surplus customers receive for free with or without the purchase of a gift card.  Gift cards can never be used to purchase sweepstakes entries or to enter or play additional sweepstakes games.  In other words, a $20 gift card can only be used to buy things on Gift Surplus' e-commerce portal.

65.  Unlike slot machines and other gambling devices, Gift Surplus' sweepstakes promotion requires no consideration and does not allow players to "bet" anything of value.

66.  Whether a player wins or loses his or her free sweepstakes prize depends on the game's outcome. And the outcome of the game is dependent on

21

skill or dexterity, with every player who successfully completes his or her game receiving a positive-value, cash prize.

### *Gift Surplus' Partnership with Local Businesses*

67.    In addition to the business benefit the sweepstakes promotion brings to Gift Surplus, Gift Surplus' promotional game has proven to be an essential marketing device for the numerous retail locations that house Gift Surplus's kiosks.

68.    Many of Gift Surplus' kiosks are in rural, retail stores that struggle to generate foot traffic.  The kiosks are a critical tool for small business owners seeking to attract repeat and new customers to purchase the products and services offered by these small business owners.

69.    Quite often, large and mid-size supermarkets, gas stations, and chain stores ignore rural communities because of their low population density and lower per capital income.  As a result, the small businesses that offer Gift Surplus kiosks, many of which are minority-owned and operated, frequently provide the only easily accessible option residents that want to purchase basic necessities, such as gasoline, food, toiletries, over-the-counter drugs, first-aid and emergency supplies, and basic business services such as copiers and fax services.

22

70.    Yet, many of these same small, rural business owners struggle to pay the fixed monthly costs of their stores, including rent, utilities, and employee salaries.   The COVID-19 pandemic has only exacerbated these struggles.

71.    For these small, rural businesses, their business relationships with third-party vendors like Gift Surplus provide critical supplemental income and generate additional foot traffic in their stores.

72.    Without the supplemental income provided by partnership with Gift Surplus, many of these small rural retailers would be forced to go out of business, lay off employees, and/or significantly reduce their stores' hours of operation.

73.    The Supreme Court accepted the State's unsupported assertions that Gift Surplus' targets "low-income customers." *Gift Surplus*, 2022-NCSC-1, ¶5.   But the trial court, whose factual findings were not challenged on appeal, found on this issue as follows: "The Gift Surplus sweepstakes promotion is a unique, innovative, and effective way to acquire new customers for the Gift Surplus e-commerce and social gaming websites.   Customers who patronize convenience stores are a good demographic for social gaming products as well as consumer products.   Convenience stores have a high volume of such customers."  *See* Exhibit B.  Gift Surplus is not focused on its customers'

23

income levels. Rather, like any other retail business, Gift Surplus target customers are those most likely to be interested in its products.

***Criminalization of Certain Sweepstakes Promotions in North Carolina***

74.     Under the plain language of North Carolina statutory law, promotional sweepstakes are not per se illegal.

75.     Nevertheless, the State has repeatedly attempted to find ways to prohibit or shut down a subset of promotional sweepstakes: video sweepstakes. Before 2008, numerous law enforcement agencies unsuccessfully tried to use North Carolina's gambling statutes to prosecute companies and business owners who offered video-sweepstakes promotions.

76.     After one of those companies obtained an injunction holding that its sweepstakes promotion was not unlawful gambling, the North Carolina General Assembly enacted N.C. Gen. Stat. § 14-306.3. *See* <u>Exhibit A</u> attached hereto and incorporated by reference.  Section 14-306.3 criminalizes server-based sweepstakes promotions that utilize specific gaming simulations, like video poker.   In response, companies conformed with this new law by eliminating these gaming simulations from their server-based sweepstakes promotions.

77.     After courts found these revised promotions to be legal, the North Carolina General Assembly in 2010 enacted the Video-Sweepstakes Statute,

which criminalizes the operation of "sweepstakes" promotions that employ an "entertaining display." N.C. Gen. Stat. § 14-306.4(b).

78.    A "sweepstakes" is statutorily defined, in relevant part, as any game through which "a person may enter to win or become eligible to receive any prize, the determination of which is based upon chance." N.C. Gen. Stat. § 14-306.4(a)(5).

79.    An "entertaining display" is defined, in relevant part, as "visual information, capable of being seen by a sweepstakes entrant, that takes the form of actual . . . or simulated game play," including many specific types of casino-themed video games of chance like video poker. N.C. Gen. Stat. § 14-306.4(a)(3).

80.    Additionally, the Statute contains vague catch-all language that purports to bring all other games "not dependent on skill or dexterity" within the definition of an entertaining display. N.C. Gen. Stat. § 14-306.4(a)(3)(h)-(i). The statute does not define "skill or dexterity." Nor does it provide any guidance as to how "skill or dexterity" must manifest itself in the entertaining display for a video game to be legal.

81.    Outside the video sweepstakes context, the same "skill or dexterity" qualifier applies to video games offered on tribal lands under the State's tribal compact with the Cherokee tribe. The State has certified that

25

the tribe's video slot machines—games where players simply push buttons to determine if the machine's random alignment of images over which the player as no control will award prizes—comply with the necessary level of skill or dexterity.

82. The legislature's stated purpose in adopting the Video-Sweepstakes Statute was to address the use of "electronic machines and devices *to gamble* through *pretextual sweepstakes* relationships with Internet service, telephone cards, and office supplies, among other products." 2010-103 N.C. Sess. Laws (emphases added). Acknowledging that at least some of what it was seeking to ban was not actually gambling, the legislature contended that these video sweepstakes "create the same *encouragement* of vice and dissipation as other forms of gambling." *Id.* (emphasis added).

83. The Statute expressly states that it is intended to outlaw sweepstakes promotions that comply with the plain language of the Statute, but that do so through the use of "subterfuge or pretense." *Id.* "Subterfuge and pretense" are not defined. According to the Supreme Court, subsection (c) authorizes the appellate courts to "inquire, not into the name, but into the game, however skillfully disguised, in order to ascertain if it is prohibited." *Gift Surplus*, 2022-NCSC-1, ¶ 34.

84.     Since passage of the Video-Sweepstakes Statute, Gift Surplus and its business associates have found their businesses under constant attack from Defendants and local law enforcement agencies, including the Moore County Sheriff's Department, the Richmond County Sheriff's Department, the Caswell County Sheriff's Department, the Salisbury Police Department, and the Archdale Police Department, among others, who have claimed that Gift Surplus' sweepstakes promotions are illegal but struggle to articulate the basis for this contention.

85.     Law enforcement have repeatedly taken this position even though the games lack two essential elements of gambling:  (1) the games require players to exercise skill or dexterity to successfully solve a game-based puzzle, and (2) and the games never require players to bet or risk anything of value (i.e., no consideration) to win a sweepstakes prize.

86.     ALE and numerous County Sheriffs and District Attorneys in this judicial district and throughout the State have targeted the games and the businesses owners and employees who offer them as violating the Video-Sweepstakes Statute.   State and local officials have charged dozens of individuals and seized hundreds of Gift Surplus kiosks.

87.     State and local law enforcement have also conducted targeted raids of the businesses that offer their customers access to Gift Surplus' gift

cards and sweepstakes promotion kiosks, confiscating tens of thousands of dollars of cash, equipment, and other property of these customers.

88. In instances in which the raided businesses possessed ABC permits, law enforcement has threatened to report the businesses to the ABC Commission for review if they failed to immediately cease doing business with Gift Surplus.

89. Dozens of individuals who own or work in the businesses that offer Gift Surplus' kiosks have been criminally charged with felony offenses under both the Video-Sweepstakes Statute and the various gambling statutes found in Chapter 14. Individuals who play the sweepstakes promotion also risk criminal prosecution. In this judicial district alone, at least 19 individuals have been charged with criminal violations in connection with Gift Surplus' sweepstakes.

90. Despite protracted efforts by the State to prosecute these individuals, not a single person has ever been found guilty of violating any provision of Chapter 14 in connection with the Gift Surplus kiosk and video sweepstakes promotion.

91. Even when Gift Surplus and its business associates were cleared of criminal charges, the State sometimes refuses to return the seized property.

92. The State has repeatedly acknowledged that gambling requires consideration.

93. The State has attempted to charge individuals in connection with Gift Surplus' sweepstakes promotions under various statutes that by any reasonable interpretation of their language plainly do not apply to Gift Surplus' sweepstakes: N.C. Gen. Stat. § 14-292, outlawing gambling, which requires payment or wagering; §§ 14-297 and 14-301, which apply to slot machines or devices that, among other things, "require[] payment to activate play" per § 14-306; and 1§ 4-306.1A, which outlaws certain video gaming machines that "require[] payment . . . to activate play of specified games." When charges under these statutory provisions necessarily fail, the State turns to the Video-Sweepstakes Statute because the State believes Gift Surplus' kiosks encourage the same vice and dissipation that gambling does.

94. The State has never articulated the specific conduct that Gift Surplus is engaged in that constitutes or promotes illegal gambling under Chapter 14.

***Early Challenges to the Video-Sweepstakes Statute***

95. Soon after the Video-Sweepstakes Statute was enacted in 2010, various companies began challenging it in North Carolina's state courts.

29

96.   Initially, a state lawsuit was brought challenging the validity of the statute as violating the First Amendment because it sought to ban video games, a recognized form of expression protected by the First Amendment.  *See Hest Techs., Inc. v. State ex rel. Perdue,* 366 N.C. 289, 749 S.E.2d 429 (2012).  In 2012, the Supreme Court of North Carolina acknowledged that video games qualify for protection under the First Amendment but held that the law was valid because it banned *all* video games and thus was content neutral.  In an opinion based on inconsistent positions seemingly depending on the part of the First Amendment analysis it addressed, the *Hest* court incorrectly determined that the Statute regulated conduct, not speech, and that the Statute was constitutional, in part, because (1) it serves the State's interest in "combatting the 'encouragement of vice and dissipation'" allegedly presented by video sweepstakes promotions, (2) it only regulates sweepstakes that are "conducted in a manner that encourages repeated, additive, gambling-like play through the video display", and (3) it "addresses a specific type of sweepstakes operation that exploits a loophole in the state's gambling laws but presents the same social evils as gambling."  *Id.*

97.   After *Hest*, Gift Surplus began marketing its e-commerce business through entertaining video sweepstakes promotions.  Gift Surplus designed its sweepstakes promotion to operate in a manner that it believed complied with

30

the plain language of the Video-Sweepstakes Statute. But buoyed by the *Hest* court's blessing of the vague and overbroad Sweepstakes Statute, law enforcement officials continually sought to prohibit Gift Surplus' sweepstakes promotion by broadly asserting that the sweepstakes must violate some provision of Chapter 14.

98. But even after Gift Surplus obtained dismissals of the first wave of criminal charges, law enforcement's threats, harassments, seizures, and prosecutions continued.

### *Gift Surplus' Declaratory Judgment Action*

99. In response to these unrelenting efforts by law enforcement, Gift Surplus filed a state court lawsuit in 2013. That lawsuit sought a declaratory judgment that the version of Gift Surplus' sweepstakes promotion that was being used at that time did not violate the Video-Sweepstakes Statute or any of the gambling offenses found in Chapter 14.

### *Trial Court Awarded Gift Surplus Preliminary Injunctive Relief*

100. The trial court initially entered a preliminary injunction prohibiting further law enforcement efforts against Gift Surplus during the pendency of the litigation.

101.  On appeal by the State, the North Carolina Court of Appeals largely affirmed the trial court's issuance of the preliminary injunction to maintain the status quo pending a trial on the merits.

102.  On further review, the North Carolina Supreme Court concluded that a game has the "skill or dexterity" necessary to be a legal sweepstakes when the outcome of the sweepstakes game controls whether the player receives a pre-selected prize.  It further announced that the appropriate test for whether a video game has the necessary "skill or dexterity" to satisfy the sweepstakes statute is whether skill predominates over chance in the video game.   Because Gift Surplus' sweepstakes at the time had a pre-determined number of winners, a player's skill or dexterity in winning the game did not control whether he or she received a prize and was therefore found to violate the Statute.  *See Sandhill Amusements v. Miller*, 368 N.C. 91 (2015), *adopting dissenting opinion from* 236 N.C. App. 340, 364-69 (2014) (hereinafter referred to as "*Sandhill*").

### *Gift Surplus Modified its Promotion to Comply with the Video-Sweepstakes Statute*

103.  After the Supreme Court of North Carolina issued its clarification of the Video-Sweepstakes Statute, Gift Surplus revised its games in 2015 to comply with the law as interpreted by *Sandhill*. The revised sweepstakes promotion now allows *all* sweepstakes participants to win a prize as long as

32

they successfully complete the game's matching objective. Yet, like all sweepstakes and as that term is defined by the Statute itself, the prize awarded continues to be a function of chance. *See* N.C. Gen. Stat. § 14-306.4(a)(5).

104. To ensure that its games complied with the "skill or dexterity" component of the statute, Gift Surplus engaged professional experts to examine, analyze, and compare its games with video games offered by casinos on tribal land in North Carolina. The tribe's video games are required to comply with the same "skill or dexterity" test that the Supreme Court of North Carolina interpreted the Video-Sweepstakes Statute as requiring. With the assistance of these experts, Gift Surplus then designed its sweepstakes promotion games to require a *greater degree* of skill or dexterity than the State-approved video games that the State allows tribal casinos to offer.

105. Consistent with past practice, however, law enforcement nevertheless continued to threaten and charge Gift Surplus and its business partners with violations of the Video-Sweepstakes Statute. In response, Gift Surplus filed an amended complaint for declaratory judgment based on its revised sweepstakes promotion.

### *While the Trial Court Again Awarded Preliminary Injunctive Relief to Gift Surplus After the First Appeal, Law Enforcement Ignores the Injunction and Continues to Target Gift Surplus*

33

106.  The trial court again entered temporary injunctive relief that precluded law enforcement efforts against Gift Surplus and its business associates during the pendency of the litigation.  The State chose not to appeal the trial court's preliminary injunction award. Consequently, the trial court's stay of enforcement efforts remained in place throughout the pendency of the trial court litigation and during two other subsequent appeals.

107.  Despite this injunctive relief, many law enforcement agencies, including ones in this judicial district, maintained they were not bound by the trial court's order.  They continued to seize equipment used to offer Gift Surplus' sweepstakes promotion and/or to arrest individuals for alleged violations of the Video-Sweepstakes Statute as it relates to Gift Surplus' sweepstakes promotion.

108.  In May 2016, State agents seized approximately 400 Gift Surplus kiosks from approximately 115 retail locations across the State, temporarily leading to the termination of more than 75% of Gift Surplus' business until the trial court intervened and ordered the State to cease further raids pending resolution of the litigation.

109.  Still, law enforcement officials across the state, including the North Carolina Sheriffs' Association, continued to assert that they were not bound by the orders prohibiting enforcement.

34

110.   Law enforcement officials have exhibited contempt for the rule of law when trial and appellate courts issue decisions prohibiting enforcement of the sweepstakes statute against Gift Surplus' sweepstakes promotion.   For example, while the preliminary injunction was in effect, local law enforcement nevertheless indicted a Gift Surplus corporate executive and others claiming that Gift Surplus' sweepstakes promotion violated Chapter 14.   At the same time, law enforcement seized over $150,000 in cash assets from companies connected to the indicted individuals.   And the seizures extended beyond the indicted individuals. Law enforcement seized approximately $400,000 from a family member's company, while successfully pressuring local banks to close the accounts of several other family members.   After the first court appearance, law enforcement voluntarily dismissed all charges based on a purported "federal investigation" that never materialized.   But until the affected companies brought a CAFRA[1] claim for the return of their assets, law enforcement officials refused to return any of the seized funds.

### *Trial Court Awards Gift Surplus Permanent Injunctive Relief*

---

[1] The Civil Asset Forfeiture Reform Act, 18 U.S.C. § 983, governs civil forfeitures and provides a mechanism for forcing the government to return improperly seized assets.

35

111.   In December 2017 (and following years of discovery), a trial on the merits was conducted.  Both the State of North Carolina and Gift Surplus were allowed to present their best evidence and arguments as to whether this sweepstakes promotion was legal. The trial court carefully and thoroughly examined the specific sweepstakes game in question and determined that Gift Surplus' revised game did not violate the Video-Sweepstakes Statute or any of the other gambling provisions found in Chapter 14.   Based on this determination, the trial court permanently enjoined further law enforcement efforts against Gift Surplus' sweepstakes promotion. A true and correct copy of the trial court's final judgment (with its findings of fact and conclusions of law) is attached hereto as Exhibit B and incorporated herein by reference.

112.   Specifically, the trial court applied the "skill or dexterity" test for a legal video game sweepstakes pronounced by the Supreme Court of North Carolina in 2015 and found that Gift Surplus' video games used to reveal the sweepstakes prizes were dependent on the skill or dexterity of the players, and that in the alternative, skill or dexterity predominated over chance in the entire sweepstakes promotion.

113.   The trial court also found that consideration—a required element of all the gambling offenses found in Chapter 14 (other than the Video-

Sweepstakes Statute)—was not required to participate in Gift Surplus'
sweepstakes promotion.

114.  The State has since acknowledged that Gift Surplus' sweepstakes
participants are not required to pay money or risk anything of value to
participate in the Gift Surplus sweepstakes promotion.  Despite appealing the
trial court's decision, the State elected not to challenge the factfinder's
determination that Gift Surplus' sweepstakes promotion does not require
consideration.

### *Appellate Courts Again Review the Video-Sweepstakes Statute with Continually Changing Interpretations*

115.  The State appealed the trial court's final decision in February
2018.

116.  The State elected not to challenge any of the trial court's findings
of fact. Neither did the State request a stay of the trial court's permanent
injunction pending appellate review.

117.  While the State's appeal of the Gift Surplus decision was pending
in the North Carolina Court of Appeals, the Court of Appeals interpreted the
Video-Sweepstakes Statute in another case as outlawing only electronic
sweepstakes conducted through video games of chance. *See Crazie Overstock
Promotions v. State of North Carolina*, 830 S.E.2d 871, 875 (2019).

37

118.   A few months later, another Court of Appeals panel reversed Gift Surplus' declaratory judgment based on differing interpretations. In Gift Surplus' case, each member of the three-judge panel wrote a separate opinion offering a different rationale for the reversal. *Gift Surplus v. State of North Carolina*, 833 S.E.2d 703 (2019).

119.   Two of the judges interpreted the Video Sweepstakes Statute as prohibiting *all* game-based electronic sweepstakes promotions—regardless of whether the video game used by the sweepstakes promotion was dependent on skill or dexterity.  Notably, one of these two judges just a few months earlier had reached the contrary conclusion in *Crazie Overstock*—that the Video-Sweepstakes Statute only outlaws sweepstakes conducted through video games of chance.

120.   A third judge agreed with the prior Supreme Court opinion in *Sandhill* and the prior Court of Appeals opinion in *Crazie Overstock* that the video sweepstakes statute only prohibits a sweepstakes promotion that utilizes video games whose outcomes are not dependent on skill or dexterity.

121.   The inability of these appellate judges to agree on the meaning of and consistently apply the Video-Sweepstakes Statute—despite state law mandating that one Court of Appeals panel follow the precedent set by prior panels on the same issue—highlights the Statute's vagueness.

38

122. The Supreme Court of North Carolina agreed to review the inconsistent Court of Appeals opinions in *Crazie Overstock* and *Gift Surplus*. Indeed, the State conceded that the Court of Appeals' majority opinion in the *Gift Surplus* case could not be reconciled with the Supreme Court's *Sandhills* decision and was contrary to the interpretation of the Statute advanced by the State in both the trial and appellate courts.

123. The Supreme Court of North Carolina also stayed all enforcement proceedings against Gift Surplus and its business associates while the case was pending in the Supreme Court of North Carolina. The Supreme Court's stay was designed to maintain the status quo by halting all enforcement actions against Gift Surplus and its business associates while the Supreme Court decided the appeal.

124. But even while the Supreme Court appeal was still being briefed in, argued before, and decided, numerous law enforcement agencies chose to ignore the Supreme Court's stay. Law enforcement officials, including ones in this judicial district, continued to threaten enforcement of the Video-Sweepstakes Statute against Gift Surplus and its business associates. For example, on August 4, 2021, the Cleveland County Sheriff seized equipment from one of Gift Surplus' business associates in Shelby, North Carolina. On August 11, 2021, the Cherokee County Sheriff's Office sent a letter to Gift

39

Surplus's business partners threatening to enforce the Statute against Gift Surplus' kiosks beginning on August 26, 2021. And as recently as November 29, 2021, the Sheriff of Yancey County sent a letter to business owners warning of enforcement of the Statute. True and correct copies of letters from law enforcement (presented in reverse chronological order) are attached hereto as <u>Exhibit C</u> and incorporated herein by reference.

125. These are simply law enforcement agencies' most recent enforcement actions. Despite numerous stays by the trial and appellate courts, enforcement actions efforts by law enforcement officials against Gift Surplus and its business associates have persisted as described herein. Those efforts included local law enforcement actions by officials and agencies in Caswell County, Moore County, Richmond County, Rowan County, and others.

126. The North Carolina Supreme Court issued its opinion in the *Crazie Overstock* case on June 11, 2021. *Crazie Overstock Promotions*, 2021-NCSC-57. *Crazie Overstock* yielded yet another new interpretation of the Video-Sweepstakes Statute. In *Crazie Overstock*, the Supreme Court concluding that under the Statute a sweepstake using a video game is permissible only when a player's skill or dexterity determines both *whether* a prize is awarded and the *value* of the prize awarded. *Crazie Overstock Promotions, LLC v. State*, 858 S.E.2d 581 (N.C. 2021). When Crazie Overstock pointed out the inherent

40

inconsistency in the statute as interpreted (allowing sweepstakes promotions where the player's skill or dexterity determines the prize awarded while simultaneously defining a sweepstakes as a promotion where prizes are determined by chance), the Court quickly denied the motion without addressing the inconsistency raised.

127.  On February 11, 2022, the Supreme Court issued its opinion in *Gift Surplus*, 2022-NCSC-1.  *Gift Surplus* doubled down on the *Crazie Overstock* interpretation that introduced an entirely new layer of ambiguity in the Statute, holding that "if chance determines the prizes for which players may play," the sweepstakes promotion is illegal—regardless of the level of skill or dexterity required by the game.  *Gift Surplus*, 2022-NCSC-1, ¶¶ 30, 35.

128.  The interpretations in *Crazie Overstock* and *Gift Surplus* are novel and create an entirely new ambiguity in the statute because the statutory definition of sweepstakes *requires* that the prize be determined "*based upon chance*."

129.  As a result of the latest interpretations of the Video-Sweepstakes Statute, the Supreme Court has determined that Gift Surplus' current electronic sweepstakes promotion is no longer legal under North Carolina law and has permitted enforcement actions to resume.

41

130.   In its interpretations, the Supreme Court of North Carolina (and the State of North Carolina) have acknowledged that the Video-Sweepstakes Statute *only* outlaws electronic sweepstakes promotions that utilize video games of chance. *Gift Surplus*, 2022-NCSC-1, ¶¶ 18-20.  Moreover, the Video-Sweepstakes Statute is designed to permit video sweepstakes promotions that are conducted through video games that are dependent on skill or dexterity. *Id.*  They also continue to recognize the statutory definition of a sweepstakes as a promotion where the prize is determined based on chance.  *Gift Surplus*, 2021-NCSC-1, ¶ 17. Yet, under the Supreme Court's latest interpretations, a sweepstakes promotion could never comply with the newest standards.

131.   Over the years, the legislature rejected numerous requests by law enforcement to amend the statute to broaden its language and encompass more video-sweepstakes.  Copies of the rejected bills are attached as Exhibit D.

132.   Under the Supreme Court's ever-changing interpretation of the Video-Sweepstakes Statute, Gift Surplus has no meaningful way to offer a skill-based video sweepstakes promotion—despite the courts' consensus that skill-based video sweepstakes promotions were not intended to be outlawed, and are not outlawed, by the plain language of this criminal statute passed by the North Carolina General Assembly. The Supreme Court has repeatedly held that Video Sweepstakes Statute permits business to offer one type of video-

42

sweepstakes promotion: those conducted through video games of skill. But under the newest interpretations, the only way to conduct a lawful sweepstakes promotion is to not offer a sweepstakes promotion.

133. The damage that will now result to Gift Surplus and its business associates is significant and immeasurable. Like Publishers Clearing House, Gift Surplus' primary method of attracting customers to its online e-commerce portal is through its retail kiosk and related sweepstakes promotion. Customers enjoy and are entertained by the sweepstakes promotion because it is fantasy gambling. It mimics the fun and excitement of the gambling experience without the accompanying bet or risk required for traditional gambling activities. Customers also enjoy playing the game that they must successfully complete to obtain the prize. Customers who purchase Gift Surplus' gift cards gain entry into the sweepstakes promotion.

134. The sweepstakes promotion allows participants to partake in a risk-free, gaming fantasy. While the sweepstakes allows entrants to play gambling-like games to win free prizes, customers always retain the full value of any gift card they choose to buy—which can be used to purchase consumer products and/or to purchase and play prize-free, entertaining Social Games.

135. Without any meaningful guidance as to how to operate an entertaining video sweepstakes promotion in compliance with the law, Gift

43

Surplus will suffer significant lost revenue and possible closure of its e-commerce portals.

136.  In addition, because the statute has been subject to multiple conflicting judicial interpretations that do not flow from an expected or natural reading of the plain words of the statute, further efforts by Gift Surplus to design its sweepstakes promotion to comply with the newest interpretation of the law will inevitably be met with further enforcement, criminal prosecution and seizure of their property by the State.  Indeed, because law enforcement have threatened enforcement even while an injunction and stay were in place, there is no question they will pursue continued enforcement so long as Gift Surplus offers any video sweepstakes promotion—regardless of whether it complies with the Statute.  This future enforcement is made possible by the vagueness and overbreadth of the Statute and the ever-changing interpretations of the Statute by North Carolina's appellate courts.

137. Numerous state agencies, including at least some of the Defendants, have continued to threaten to prosecute those who offer Gift Surplus' video sweepstakes promotion.

***Vagueness and Overbreadth of the Video-Sweepstakes Statute***

138. As written by the North Carolina General Assembly and interpreted by the Supreme Court of North Carolina, the Video-Sweepstakes Statute is unconstitutionally vague and overbroad.

139. The Video-Sweepstakes Statute fails to give a person of ordinary intelligence notice as to what conduct is proscribed and invites arbitrary enforcement.

140. As interpreted by the Supreme Court, the statute only allows video sweepstakes promotions in which both *whether* the player wins a prize and *what* prize the player wins are dependent on skill. Yet, this interpretation renders meaningless the ordinary and statutory definition of a sweepstakes, which requires a prize to be awarded based on chance. Effectively, the latest interpretation means that no sweepstakes could ever be conducted using a videogame of skill or dexterity—even though the statute specifically carves out an exception for skill-based sweepstakes promotions. This irreconcilability renders the law confusing and unconstitutionally vague.

141. On its face, the Video-Sweepstakes Statute proscribes the operation or placing into operation any electronic machine that "[c]onducts a *sweepstakes* through the use of an *entertaining display*." N.C. Gen. Stat. § 14-306.4(b) (emphases added).

45

142. The Video-Sweepstakes Statute defines a sweepstakes as a game or promotion in which a player enters or becomes eligible to receive any prize that is "determine[ed] . . . based upon chance." N.C. Gen. Stat. § 14-306(a)(5).

143. However, the Video-Sweepstakes Statute, as interpreted by *Crazie Overstock* and *Gift Surplus*, defines a prohibited "entertaining display" to include any video sweepstakes promotion in which the *prize* is selected based on chance.

144. But advertising promotions cannot be a "sweepstakes" under the statute if the individual <u>prize</u> associated with each sweepstakes entry must be determined based on the skill or dexterity of the player. That is because by common and statutory definition, a "sweepstakes" is an advertising promotion where the prize must be selected or determined based on chance. *See* N.C. Gen. Stat. § 14-306.4 (defining a "sweepstakes" as an advertising promotion where a person is "eligible to receive any prize, the determination of which is based upon chance."); Sweepstakes, Black's Law Dictionary (11th ed. 2019) (""A contest, often for promotional purposes, that awards prizes based on the random selection of entries."); State of North Carolina's New Brief to the Supreme Court, excerpts attached hereto as <u>Exhibit E</u>, at 13. ("Sweepstakes are random drawings for prizes that real businesses use to promote their products.").

46

145. In other words, the Video-Sweepstakes Statute, the dictionary, and State's Attorney General all agree: the very essence of the definition of a sweepstakes is that <u>prizes</u> must be selected by random chance.

146. Thus, the Video-Sweepstakes Statute, as interpreted by *Crazie Overstock* and *Gift Surplus*, contains an irreconcilable ambiguity: On the one hand, the plain language of the Statute permits *sweepstakes* promotions that determines prizes randomly as long as the video games used to claim or reveal those prizes are dependent on skill or dexterity. But under the state court's interpretation of this same statute, a "sweepstakes" can never award prizes to players randomly.

147. By interpreting the skill or dexterity requirement to apply to the particular prize that each sweepstakes entrant is playing for, the Supreme Court of North Carolina has created internal inconsistencies within the Video-Sweepstakes Statute. Those inconsistences leave person of reasonable intelligence incapable of discerning how to conduct a legal sweepstakes using an electronic machine or device in North Carolina.

148. Additionally, the Statute is impermissibly vague as to whether it bans some or all video-sweepstakes games. The state Supreme Court has issued two binding, but conflicting, interpretations of the statute's scope. One opinion states that the Statute broadly applies "regardless of the content of the

47

video game," *Hest*, 366 N.C. at 300, 749 S.E.2d at 437, while another states that the Statute imposes content-based restriction that prohibit only *some* video games. *Crazie Overstock Promotions*, 2021-NCSC-57; *Sandhill Amusements*, 368 N.C. 91, 773 S.E.2d 55.

149.   Further, the statute provides no meaningful guidance on what constitutes the level of "skill or dexterity" necessary to remove a game from the illegal statute, which has led to inconsistent enforcement.

150.   For example, in what highlights the risk of arbitrary and selective enforcement of the statute, the State routinely interprets the same "skill or dexterity" requirement much less stringently when applied to tribes whose video gaming machines are subject to the same "skill or dexterity" test.  In other words, state officials routinely find that videos games involving much less skill or dexterity than those offered by Gift Surplus to be lawful games of skill under the same predominant-factor test.  What's more, the State has never required the particular prizes awarded by the tribe's video games to be influenced by a player's skill or dexterity.

151.   Similarly, the threat letter from the Cherokee County Sheriff shows how the Statute encourages selective, arbitrary, and overbroad enforcement.  In this letter, the law enforcement agency admits that it cannot ascertain what sweepstakes are or are not illegal under the Statute, noting

only that the targeted games "may be prohibited under North Carolina law." Yet the Sheriff promised to arrest anyone who failed to comply with the Statute by August 26, 2021. Likewise, the Yancey County Sheriff issued a public notice on November 29, 2021, indicating that *any* sweepstakes conducted through the use of an entertaining display is prohibited, ignoring entirely the "skill or dexterity" aspects of the Statute. Law enforcement feels empowered to make these threats because the Statute's vague and overbroad language (along with the appellate courts' broad and ever-shifting interpretation on this criminal statute), has given law enforcement confidence that any arrest they decide to make will be retroactively justified and upheld under this Statute. *See* Exhibit C.

152. Significantly, the trial courts and juries that have actually evaluated Gift Surplus games in both criminal and civil proceedings *have repeatedly found Gift Surplus' games to be dependent on skill or dexterity* (and thus in compliance with the Statute)—only to have law enforcement officers continue to charge people for violation of the Video-Sweepstakes Statute as it relates to Gift Surplus' games.

153. As far as Gift Surplus can tell, the only consistency in application of the statute by law enforcement and the North Carolina appellate courts is that whatever video sweepstakes promotion is offered by Gift Surplus,

authorities will find some way to deem it to violate the Statute, regardless of whether it actually does violate the plain language of the Statute.

### First Amendment Infringement

154.   The Video-Sweepstakes Statute prohibits any person from using an electronic machine or device to "[c]onduct a sweepstakes through the use of an entertaining display."

155.   The Video-Sweepstakes Statute broadly defines "entertaining display" as "visual information, capable of being seen by a sweepstakes entrant, that takes the form of actual game play, or simulated game play."  In addition to the general definition, the Video-Sweepstakes Statute includes a list of examples "by way of illustration and not exclusion" that includes various forms of video games and other electronic games.

156.   The apparent *practical* effect of the Video-Sweepstakes Statute, as written and as interpreted and applied by the Supreme Court of North Carolina, is to ban the use of video games that simulate gambling as an entertaining means to communicate the results of a promotional sweepstakes. The Video-Sweepstakes Statute seeks to criminalize sweepstakes promotions that use video games that merely *look* like gambling because they involve gambling-like play in the form of "video games of chance", *Gift Surplus*, 2021-NCSC-1, ¶ 20—and not because they involve actual gambling.

50

157. The Video-Sweepstakes Statute is a content-based restriction on speech that is unconstitutional. By both its plain terms and judicial interpretation, the statute does not prohibit sweepstakes themselves; instead, the law prohibits the use of any "entertaining displays" (*i.e.*, video games) in connection with a sweepstakes.

158. In essence the Video-Sweepstakes Statute by its design and in its interpretation and implementation targets a legitimate form of expression: what the State perceives to be "gambling-like" expression that occurs when a sweepstakes promotion is conducted through a particular form of speech.

159. Video games are a form of expression entitled to the same constitutional protections as art, film, literature, and other forms of entertainment. And the video games used by Gift Surplus as part of its promotional sweepstakes are, by design, conveying information in a creative, expressive, and entertaining way. Thus, because the Video-Sweepstakes Statute directly targets and regulates protected First Amendment activity, the law is unconstitutional.

160. Despite the law's stated purpose being to ban gambling associated with pretextual sweepstakes, the Statute (according, at least, to the *Hest* court) bans all forms of electronic speech associated with any legitimate sweepstakes

promotion. The Statute is therefore not tailored in any fashion to serve the purported state interest.

161. The Video-Sweepstakes Statute is also purportedly necessary because "simulated game play create[s] the same encouragement of vice and dissipation as other forms of gambling." 2010-103 N.C. Sess. Laws.

162. But "the government may not prohibit speech because it increases the chance an unlawful act will be committed 'at some indefinite future time.' *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253, 122 S. Ct. 1389, 1403, 152 L. Ed. 2d 403 (2002) (quoting *Hess v. Indiana,* 414 U.S. 105, 108, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973) (*per curiam*). It is for this reason that simulated child pornography, and simulated violence and sexual assault like that found in many popular video games, cannot permissibly be banned. If banning simulated child pornography and banning simulated rape and murder violates the First Amendment, so must banning a sweepstakes promotion merely because it simulates gambling.

163. Gift Surplus is likely to prevail on the merits of its constitutional challenge to the Video-Sweepstakes Statute.

### *Irreparable Harm and the Public Interest*

164. The violation of rights secured by the United States Constitution is presumed to be irreparable harm. As Plaintiff's First and Fourteenth

52

Amendment Rights are violated by the Statute's interpretation, application, and enforcement, irreparable harm exists.

165. First, because the Video-Sweepstakes Statute violates the Constitution of the United States, Gift Surplus and others will suffer immediate and irreparable harm as a matter of law if enforcement of the Statute is permitted to resume. Accordingly, a preliminary injunction is necessary to enjoin enforcement of the Video-Sweepstakes Statute against Gift Surplus until the case can be heard on the merits.

166. Second, Plaintiffs and their businesses associates face criminal liability if they to attempt to conduct or offer a sweepstakes in compliance with the ever-shifting interpretation and unintelligible parameters of the Video-Sweepstakes Statute. If an injunction is not entered, they will continue to face criminal prosecutions and threats of criminal prosecution.

167. Moreover, based on the state and local law enforcement's conduct as alleged herein, including the repeated and consistent threats of prosecution and/or revocation of licenses to sell alcoholic beverages and the State's efforts to ban the use of video games in connection with promotional sweepstakes, numerous retailers have refused to sell or display Gift Surplus' products or make Gift Surplus' sweepstakes promotion available to their customers. Moreover, retailers who have previously sold and displayed Gift Surplus'

53

products through their respective sweepstakes promotions have discontinued offering such products.

168. Gift Surplus has suffered and will continue to suffer substantial and incalculable financial losses because of state and local law enforcement's conduct as alleged herein. The amount of lost revenue and the costs of reestablishing relationships with retail facilities in the State of North Carolina are incalculable. Also, regardless of the amount of damages incurred by Gift Surplus, the State would not be subject to liability for Gift Surplus' losses based on the doctrine of sovereign immunity. Consequently, absent an order from this Court enjoining the enforcement of the unconstitutional Statute against Gift Surplus, no adequate relief by way of monetary damages will be available to prevent or redress Gift Surplus' significant harm.

169. Third, the incalculable economic harm is not limited to Gift Surplus. Thousands of Gift Surplus' business partners throughout the State rely on Gift Surplus' products to remain operational. These third-party operators who offer Gift Surplus' merchandise and sweepstakes promotions on kiosks throughout the State may suffer serious harm.

170. If these retailers lose the supplemental revenue Gift Surplus helps them generate, many will be forced to shut down or drastically cut their hours, leading potentially thousands of employees to lose their jobs and the

54

community at large to lose ready access to sources of necessities like gasoline, food, and emergency supplies.

171. Fourth, if Gift Surplus loses the benefit of its proven advertising and marketing channels if law enforcement shuts down its sweepstakes promotion and/or seizes its machines, Gift Surplus' business will suffer. Customers will have less opportunity to be introduced to Gift Surplus' goods or social games. The result will be a negative impact on Gift Surplus' sales of both the goods and social games. If the impact is severe enough, Gift Surplus' customers who have balances remaining on their gift cards will be unable to redeem them and will lose the value of their purchase.

172. A preliminary injunction against enforcement of the statute will cause no harm to Defendants and is in the public interest. A state cannot be harmed by an injunction that prevents the enforcement of a potentially unconstitutional statute. And upholding and protecting constitutional rights clearly protects the public interest.

173. Moreover, the State has been enjoined nearly continuously since November 2013 from enforcing the Video-Sweepstakes Statute against Gift Surplus, its customers, and its business associates.

174. From 2013 to 2019, the State never asked the appellate courts to permit enforcement of the Statute while the State pursued multiple appeals of

the trial court's injunction orders. Indeed, after the trial court entered a 2016 preliminary injunction order, the State waived its right to immediate appellate review of that order—effectively consenting to the stay remaining in effect through years of discovery and, eventually, trial.

175.   No imminent harm will come from retaining the status quo that has already existed for eight years while the constitutionality of the Statute is addressed by the federal courts.

## FIRST CAUSE OF ACTION
### U.S. Constitution, Amend. XIV and 42 U.S.C. § 1983

176.   The allegations set forth in the foregoing paragraphs are realleged and incorporated herein by reference.

177.   Sweepstakes are generally lawful and do not violate any gaming or gambling law of the State of North Carolina.

178.   The Video-Sweepstakes Statute purports to outlaw only "sweepstakes" that rely on an "entertaining display."

179.   As interpreted by the Supreme Court of North Carolina, the Video-Sweepstakes Statute defines "entertaining display" in such a way that a promotion using an entertaining display cannot also be a sweepstakes. Thus, it is impossible for a person of reasonable intelligence to know how an electronic sweepstakes can be legally conducted.

56

180.   Moreover, the interpretation of the Video-Sweepstakes Statute in *Hest*, which is seemingly inconsistent with later Supreme Court of North Carolina jurisprudence and thus is maybe or maybe not good law, contributes to the Statute's vagueness.

181.   The broadly sweeping provision in the Statute indicating that it applies to otherwise legal sweepstakes promotions that are legal only through "subterfuge and pretext," also renders the Statute unconstitutionally vague and begs for selective enforcement.

182.   In all, the Video-Sweepstakes Statute is unconstitutionally vague and overbroad and therefore violates the Fourteenth Amendment right under the United States Constitution to due process and equal protection under the laws.

183.   The Video-Sweepstakes Statute also treats businesses using promotional sweepstakes that have an "entertaining display" differently from similarly situated businesses using all other forms of promotional sweepstakes.

184.   The Video-Sweepstakes Statute is arbitrary and irrational, lacks any plausible rational basis, and is based on facts which could not reasonably be conceived to be true by the members of the General Assembly.  Accordingly,

57

the law violates the Due Process and Equal Protection Clauses of the United States Constitution.

185. Gift Surplus will suffer immediate and irreparable harm if Defendants are permitted to resume enforcement efforts under the Video-Sweepstakes Statute. Gift Surplus is engaged in and intends to continue to engage in its sweepstakes promotion described herein, and there exists a credible threat of prosecution under N.C. Gen. Stat. § 14-306.4 for its promotion in light of the courts' unconstitutional interpretations of the statute and repeated threats by law enforcement.

186. Gift Surplus is therefore entitled to a declaratory judgment that the Video-Sweepstakes Statute is unconstitutional. Plaintiffs are further entitled to a preliminary and permanent injunction enjoining enforcement of the Video-Sweepstakes Statute as applied to Gift Surplus' software.

## SECOND CAUSE OF ACTION
### U.S. Constitution, Amend. I and 42 U.S.C. § 1983

187. The allegations set forth in the foregoing paragraphs are realleged and incorporated herein by reference.

188. On its face and as applied to Gift Surplus' sweepstakes promotion, the Video-Sweepstakes Statute directly targets and regulates expressive activity that is protected by the First Amendment of the United States Constitution.

58

189.   The Video-Sweepstakes Statute is a content-based restriction of expression.

190.   The Video-Sweepstakes Statute is therefore presumptively invalid and subject to strict scrutiny.

191.   The Video-Sweepstakes Statute fails review under strict scrutiny because the State does not have a compelling reason for banning sweepstakes that using expressive, interactive video games that simulate gambling.   In addition, the Video-Sweepstakes Statute is not the least speech-restrictive means to accomplish the State's purported goals.

192.   The Video-Sweepstakes Statute is also unconstitutional under any other standard of constitutional scrutiny because of its burden on protected First Amendment activity.

193.   The Video-Sweepstakes Statute is also overbroad in violation of the First Amendment.

194.   The Statute was purportedly enacted to address the "vice and dissipation" found in "other forms of gambling . . . by encouraging repeated play."  2010 N.C. Sess. Laws 103.

195.   But the Statute does not target gambling at all, nor is it limited to repetitive play.  Instead, the Statute prohibits any sweepstakes promotion that

uses any "form of actual game play, or simulated game play." N.C. Gen. Stat. § 14-306.4.

196. Because of the varying, and ever-changing interpretations of the Statute, the Statute criminalizes games that have no connection whatsoever to gambling, and cannot even be argued to have that connection.

197. Existing sweepstakes run by companies like Publisher's Clearing House, Heineken, and Mondelez International, the parent company for snack brands like Chips Ahoy! and Ritz, which also involve electronic video games, would also be illegal.

198. Gift Surplus and others will suffer immediate and irreparable harm if Defendants are permitted to resume enforcement efforts under the Video-Sweepstakes Statute.

199. Gift Surplus is therefore entitled to a declaratory judgment that the Video-Sweepstakes Statute is unconstitutional under the First Amendment. Gift Surplus is further entitled to a preliminary and permanent injunction enjoining enforcement of the Video-Sweepstakes Statute as applied to Gift Surplus' video sweepstakes promotion.

WHEREFORE, Plaintiff Gift Surplus respectfully requests that the Court:

1. Grant Gift Surplus temporary and preliminary injunctive relief prohibiting enforcement of the Statute based on operation of Gift Surplus' promotional sweepstakes pending resolution of this litigation;

2. Enter a judgment declaring the Statute unconstitutional as a violation of due process guaranteed by the Constitution of the United States and prohibiting therefore permanently its enforcement;

3. Enter a judgment declaring the Statute unconstitutional as a violation of free speech protections under the First Amendment to the Constitution of the United States and therefore permanently prohibiting its enforcement;

4. Award Gift Surplus its reasonable attorneys' fees pursuant to 42 U.S.C. § 1988(b);

5. That a jury trial be had as to any issues so triable; and

6. Grant Gift Surplus such other relief as justice requires.

This the 22nd day of February, 2022.

/s/Patrick M. Kane
Patrick M. Kane (NC Bar No. 36861)
Richard A. Coughlin (NC Bar No. 19894)
Elizabeth Sims Hedrick (NC Bar No. 38513)

FOX ROTHSCHILD LLP
230 N. Elm Street, Suite 1200
Greensboro, NC  27401
Telephone:  336.378.5397
Facsimile:  336.378.5400
rcoughlin@foxrothschild.com
pkane@foxrothschild.com
ehedrick@foxrothschild.com

## VERIFICATION

Mark Nizdil, under penalty of perjury, states as follows: that he is over eighteen years of age and has not been declared incompetent; that he is an independent contractor and consultant for Plaintiff Gift Surplus, LLC; that he is authorized to make this verification on Gift Surplus' behalf; and that he has read the foregoing Verified Complaint and knows the contents thereof to be true of his own knowledge or based upon records in the possession and custody of the limited liability company and therefore within the limited liability company's knowledge.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

This the _18_ day of February, 2022.

_____
MARK NIZDIL

130916517.1